UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

IN THE MATTER OF THE EXTRADITION OF

MARIANNE SMYTH

Misc. No. 1:24-mc-00084-JCN

COMPLAINT
(18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1. In this matter, I represent the United States in fulfilling its treaty obligation to the United Kingdom.

2. There is an extradition treaty in force between the United States and the United Kingdom.[1]

3. Pursuant to the Treaty, the Government of the United Kingdom has submitted a formal request through diplomatic channels for the extradition of Marianne Smyth ("Smyth").

4. According to the information the Government of the United Kingdom has provided, Smyth is accused with committing four counts of fraud by abuse of position, in violation of Sections 1 and 4 of the United Kingdom's Fraud Act of 2006, and four counts of theft in violation of Section 1 of Northern Ireland's Theft Act of 1969, by

---

[1] *See* Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31, 2003, S. TREATY DOC NO. 108-23 (2004) (the "2003 Treaty"), and related Exchanges of Letters, *as amended by the* Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. TREATY DOC. NO. 109-14 (2006) (the "Instrument"), with Annex (the "Annex") reflecting the integrated text of the operative provisions of

implementing four fraudulent schemes between March 2008 and October 2010. At the time of fraudulent offenses, Smyth worked as an independent mortgage adviser for An Independent Mortgage Solution Ltd (AIMS). While occupying a position in which she was expected to safeguard, or not to act against, the financial interests of the clients, Smyth failed to invest for and stole from: (1) J.S. and I.S., in the amount of £20,000 (approximately $25,500); (2) S.S., in the amount of £20,000 (approximately $25,500); (3) S.R. in the amount of £23,000 (approximately $29,000); and (4) D.M. in the amount of £72,570 (approximately $92,000).

5. These offenses were committed within the jurisdiction of the United Kingdom, in Northern Ireland. On February 26, 2021, the Magistrate's Court in Northern Ireland issued eight warrants for Smyth's arrest for the aforementioned offenses. On September 8, 2023, three of the warrants were withdrawn for typographical errors, and the Magistrates Court re-issued those three warrants that same day.

6. According to the information from the Government of the United Kingdom:

a. On July 3, 2009, the Police Service of Northern Island ("PSNI") received allegations of fraud and theft against Marianne Smyth. Smyth had left the United Kingdom and returned to the United States.

b. On September 16, 2009, J.S. provided a written statement. He stated that he met Smyth in 2009 as an employee of AIMS, when she arranged a new mortgage on his home. J.S. said that Smyth offered him an opportunity to invest in a high interest-

---

the 2003 Treaty and the Instrument (collectively, the "Treaty").

2

bearing account held with the Commonwealth Bank of Australia. On June 15, 2009, J.S. and his wife, I.S., met with Smyth. I.S. gave Smyth a cheque in the sum of £20,000 (approximately $25,500) to be invested in the promised high interest-bearing account. The cheque was made payable to "Marianne Smyth." I.S. provided a written statement to the police on July 11, 2019, corroborating her husband's statement and adding that she had not seen or heard from Smyth since the day they met to give her the cheque.

   c.   PSNI examined statements from a bank account held by Smyth with Bank Santander. They confirmed that a cheque in the sum of £20,000 was deposited in the account on June 16, 2009, one day after issuance. The statements cover the period from May 2007 until the account was closed on October 4, 2010. Police did not find any evidence that the funds were invested as promised, or that they were returned to J.S. or I.S.

   d.   On September 16, 2009, S.S. provided a written statement. He stated that he met Smyth in 2008 as an employee of AIMS, when she arranged a new mortgage on his home. He said that Smyth offered him an opportunity to invest in a high interest-bearing account held with the Commonwealth Bank of Australia, with a return of £400 (approximately $500) per month on an investment of £20,000 (approximately $25,500). On October 27, 2008, S.S. gave Smyth a cheque in the sum of £20,000 made payable to "Marianne Smyth", to be invested in the promised high interest-bearing account. Smyth provided S.S. with a hand-written receipt on AIMS headed paper, and a statement from the Commonwealth Bank of Australia dated December 1, 2008, for an account number XXXXXX70. From November 2008, until April 2009, and then again in June 2009, S.S. received into his account what he believed to be the returns on his

3

investment, in the form of £400 every month. After June 2009, the payments stopped, and S.S. contacted the Commonwealth Bank of Australia to inquire. A bank representative informed him that they had no record of an account associated with his name and that the account number XXXXXX70 did not exist. S.S. attempted to contact Smyth after that but was not successful.

  e. PSNI examined the statements from a bank account held by Smyth with Bank Santander. The police confirmed that a cheque in the sum of £20,000 was deposited in the account on October 28, 2008, one day after issuance. The statements cover the period from May 2007, until the account was closed on October 4, 2010. Police did not find any evidence that the funds were returned to S. Savage or invested as promised, instead they found a monthly transfer of £400 from Smyth's account to S.S.'s account between November 2008 and March 2009. Police also examined a copy of the receipt Smyth gave S.S. on an AIMS headed paper. The receipt is dated October 27, 2008, with a handwritten note "Receipt of £20,000. £400 per month on 15th each month close of business, into nominated Abbey account." It is signed "Marianne Smyth".

  f. On August 1, 2009, S.R. provided a written statement. S.R. stated that she met Smyth around 2005, as an employee of AIMS, when she arranged a new mortgage on her home. They later became friends, meeting socially on occasion. S.R. said that Smyth offered her an opportunity to invest in a high interest-bearing account, and that S.R. agreed to invest £23,000 (approximately $29,000). S.R. transferred for that purpose £6,000 (approximately $7,600) on August 28, 2008, and £17,000 (approximately $21,400) on September 30, 2008, to an account held by Smyth. S.R.

4

stated that she made several requests to release some of her invested funds after May 2009, and that Smyth always made excuses and did not release the funds. S.R. stated that she has not heard from Smyth since ~~June~~ went (or) 2009, and that her later attempts at contacting Smyth through email ~~wet~~ unanswered.

    g.    PSNI examined the statements from a bank account held by Smyth with Bank Santander. The police confirmed that a sum of £17,000 was transferred into Smyth's account on September 30, 2008, from an account held by S.R. The statements cover the period from May 2007, until the account was closed on October 4, 2010. Police did not find any evidence that the funds were returned to S.R. or invested as promised.

    h.    On August 20, 2009, D.M. provided a written statement. D.M. stated that he met Smyth in around 2006 or 2007, as an employee of AIMS, when she arranged a new mortgage on his home. D.M. reported that in 2008, Smyth recommended that he and his wife, I.M., purchase a property at 3 Bracken Avenue, Newcastle, County Down. D.M. and his wife agreed to purchase the property, and D.M. gave Smyth two cheques to that end: one cheque in the sum of £5,000 (approximately $6,400) on March 21, 2008, and another cheque in the sum of £67,570 (approximately $85,600) on July 30, 2008. Both cheques were made payable to "Marianne Smyth." D.M. stated that he and his wife did not seek independent legal advice. Smyth arranged all the legal matters and presented them with what they believed to be a "contract of sale" that they signed. Smyth also arranged for tenants to rent the property and informed D.M. that she was to collect on his behalf a rental payment of £425 (approximately $540) per month, that she would deposit in his account. D.M. reported that the sum of £425 was paid into his account each month from August 2008 until May 2009. He received no further rental

5

payments after that. D.M. repeatedly asked Smyth for the property deeds but never received them. On July 1, 2009, D.M. and his wife went to visit the property and spoke to the occupants. D.M. suspected that he was not the legal owner of the property. He attempted to contact Smyth several times after that by telephone and email but did not receive any response.

  i. PSNI examined the statements from a joint bank account held by D.M. and his wife. The police confirmed that a sum of £ 5,000 left the account on March 25, 2008, and the sum of £ 67,570 left the account on August 12, 2008. When reviewing the records from a bank account held by Smyth with Bank Santander. The police confirmed that a cheque in the sum of £67,570 was paid into Smyth's account on August 9, 2008. The police reported that the cheque was lodged into the account on August 9, but did not clear until August 12. The records also showed that the sum of £425 was transferred from Smyth's account to the M.'s account on August 30, 2008. The statements cover the period from May 2007, until the account was closed on October 4, 2010. Police did not find any evidence that the funds were returned to D.M.

  j. PSNI also searched Smyth's home and located the alleged "contract of sale" dated August 7, 2008, and signed by D.M. and his wife. A search of the records held by land and Property Services revealed to PSNI that the property on 3 Bracken Avenue, New Castle, County Down, was legally owned by J.B. and L.B.

  k. J.B. provided a statement on July 8, 2019, confirming that he had owned the property in question with his wife since around 1998, and that he had not sold or agreed to sell the property at any time. He stated that he had met Smyth in or around 2008 when he had considered re-mortgaging his property but had not proceeded with

the re-mortgage.

l.  On July 24, 2018, D.C., a director at AIMS, provided a statement to PSNI, and confirmed that Smyth worked as a mortgage advisor for AIMS between 2006 and 2009. He stated that AIMS is a mortgage and insurance provider only and do not arrange or advise on investments of any kind.

m.  All five victims provided statements to the police and identified a stock picture of Smyth as the person who defrauded them and stole their money.

n.  According to U.S. law enforcement, Smyth's last arrival in the United States was on June 25, 2013, utilizing a U.S. passport. She has not departed the United States since that date.

7.  The United States Marshals Service believes Smyth may be found within the jurisdiction of this Court at 220 Mahoney Hill Road, Bingham, Maine, 04920. I have spoken with Deputy U.S. Marshal Spencer Christie who conducted surveillance of 220 Mahoney Hill Road on January 22, 2024 and he confirmed that he observed Smyth at the residence that day.

8.  Stacy Hauf, an attorney in the Office of the Legal Adviser for the U.S. Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic notes by which the United Kingdom submitted its request for extradition and the subsequent supplement with additional information relating to this request, stating that Article 2 of the Annex covers the offenses for which the United Kingdom seeks extradition, and confirming that the documents supporting the request for extradition bear the certificate or seal of the Ministry of Justice, or the Ministry or Department responsible for foreign affairs of the United Kingdom, in

7

accordance with Article 9 of the Annex, so as to enable them to be received in evidence.

9. The declaration from the U.S. Department of State with its attachments, including copies of the diplomatic notes from the United Kingdom, the Treaty, and the certified documents the United Kingdom submitted in support of the request (marked collectively as Government's **Exhibit 1**) are incorporated by reference herein.

10. Smyth likely would flee if she learned of the existence of a warrant for her arrest.

WHEREFORE, the undersigned requests that a warrant for Smyth's arrest issue in accordance with 18 U.S.C. § 3184 and the Treaty, so that Smyth may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered, and that this complaint and the warrant be placed under the seal of the Court until such time as the warrant is executed.

*[signature]*
Joel B. Casey
Assistant United States Attorney

Sworn to before me and subscribed in my presence this 23rd day of February 2024, at Bangor, Maine.

*[signature]*
John C. Nivison
United States Magistrate Judge

8