**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

IN THE MATTER OF THE EXTRADITION OF

MARIANNE SMYTH

Misc. No. 1:24-mc-00084-JCN

## GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF EXTRADITION

### Introduction

The Government of the United Kingdom seeks the extradition of Marianne Smyth to stand trial for four counts of fraud by abuse of position, in violation of Sections 1 and 4 of the United Kingdom's Fraud Act of 2006, and four counts of theft in violation of Section 1 of Northern Ireland's Theft Act of 1969. Acting under its Treaty obligations,[1] the United States filed a complaint against Smyth. By statute, this Court must now hold an extradition hearing to determine whether the evidence included in the United Kingdom's extradition request is "sufficient to sustain the charge[s]" for which the United Kingdom seeks extradition. 18 U.S.C. § 3184; *see also, e.g., Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984).

If the Court finds the United Kingdom's evidence sufficient, it must "certify the same" to the Secretary of State, who, in turn, will ultimately decide whether to grant

---

[1] *See* Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31, 2003, S. TREATY DOC NO. 108-23 (2004) (the "2003 Treaty"), and related Exchanges of Letters, *as amended by* the Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. TREATY DOC. NO. 109-14 (2006) (the "Instrument"), with Annex (the "Annex") reflecting the integrated text of the operative provisions of the 2003 Treaty and the Instrument (collectively, the "Treaty"). Dkt. Entry No. 3-1 at 1-27.

1

extradition and surrender Smyth to the United Kingdom. 18 U.S.C. §§ 3184, 3186; *see also, e.g., Martin v. Warden, Atlanta Penitentiary*, 993 F. 2d 824, 829 (11th Cir. 1993) (After the court has completed its "limited inquiry, the Secretary conducts an independent review of the case to determine whether to issue a warrant of surrender." In doing so, the Secretary "exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not.").

The scope of the extradition process before the Court is limited, and the United Kingdom's extradition request is sufficient under the law. The Court has the authority and jurisdiction to conduct these proceedings, and the Treaty, which is in full force and effect, covers the offenses for which extradition is requested. The United Kingdom, moreover, has provided probable cause to believe Smyth has committed each of the eight offenses for which her extradition is sought. The Court therefore should certify Smyth's extradition to the United Kingdom for the offenses for which extradition is requested.

## BACKGROUND

The United Kingdom's request for extradition contains a discussion of evidence supporting the following facts upon which eight criminal offenses are based and for which extradition is sought. *See generally* Dkt. Entry No. 3-1 at 28-62, 80-103.[2] In this

---

[2] The Complaint filed by the Government in support of its application for an extradition warrant in this matter was submitted with (a) the Declaration of Stacy Hauf, Attorney Adviser in the Office of the Legal Adviser for the U.S. Department of State ("Hauf Decl."); (b) copies of the diplomatic notes submitted by the Government of the United Kingdom; (c) a copy of the Treaty; and (d) copies of the documents the United Kingdom submitted in support of its extradition request. *See generally* Dkt. Entry No. 3-1. As the documents submitted by the United Kingdom contain the certificate or seal of the Ministry of Justice or the Ministry of Foreign Affairs, they are automatically admissible in these extradition proceedings. *See* Dkt. Entry No. 3-1 at 16, Treaty Article 9 ("Authentication of Documents").

regard, the Police Service of Northern Ireland ("PSNI") conducted an investigation into allegations of fraud and theft committed by Smyth in Northern Ireland between 2007 and 2010. PSNI identified five victims of the offenses committed by Smyth while employed as a mortgage advisor with An Independent Mortgage Solution Ltd (AIMS) in Northern Ireland 2006 and 2009. The evidence collected by PSNI concerned four occurrences of fraud and theft that are discussed below.

### A.    Fraud and theft #1[3]

On September 16, 2009, J.S. provided a statement to the PSNI. He stated that he met Smyth in 2009 as an employee of AIMS, when she arranged a new mortgage on his home. J.S. said that Smyth offered him an opportunity to invest in a high interest-bearing account held with the Commonwealth Bank of Australia. On June 15, 2009, J.S. and his wife, I.S., met with Smyth. I.S. gave Smyth a cheque in the sum of £20,000 (approximately U.S. $29,000)[4] to be invested in the promised high interest-bearing account. The cheque was made payable to "Marianne Smyth."  I.S. provided a statement to the police on July 11, 2019, corroborating her husband's statement and adding that she had not seen or heard from Smyth since the day they gave her the cheque.

PSNI examined statements from a bank account held by Smyth with Bank Santander. They confirmed that a cheque in the sum of £20,000 was deposited in the account on June 16, 2009, one day after issuance. The statements cover the period from

---

[3] The evidence collected by PSNI concerning these offenses is set forth in the materials attached to the complaint in this matter. *See generally* Dkt. Entry No. 3-1 at 35-36.

[4] This estimate is based on an exchange rate of 1.4602 U.K. pounds to 1 U.S. dollar on June 15, 2009. *See* Board of Governors Federal Reserve System, Foreign Exchange Rates—H-10 Historical rates for the U.K pound, *available at* https://www.federalreserve.gov/releases/h10/hist/dat00_uk.htm.

May 2007 until the account was closed on October 4, 2010. PSNI did not find any evidence that the funds were invested as promised, or that they were returned to J.S. or I.S.

### B.    Fraud and theft #2[5]

On September 16, 2009, S.S. provided a statement to PSNI. He stated that he met Smyth in 2008 as an employee of AIMS, when she arranged a new mortgage on his home. He said that Smyth offered him an opportunity to invest in a high interest-bearing account held with the Commonwealth Bank of Australia, with a return of £400 per month on an investment of £20,000. On October 27, 2008, S.S. gave Smyth a cheque in the sum of £20,000 (approximately U.S. $30,944)[6] made payable to "Marianne Smyth", to be invested in the promised high interest-bearing account. Smyth provided S.S. with a hand-written receipt on AIMS headed paper, and a statement from the Commonwealth Bank of Australia dated December 1, 2008, for an account number XXXXXX70. From November 2008, until April 2009, and then again in June 2009, S.S. received into his account what he believed to be the returns on his investment, in the form of £400 every month. After June 2009, the payments stopped, and S.S. contacted the Commonwealth Bank of Australia to inquire. A bank representative informed him that they had no record of an account associated with his name and that the account number XXXXXX70 did not exist. S.S. attempted to contact Smyth after that but was

---

[5] The evidence collected by PSNI concerning these offenses is set forth in the materials attached to the complaint in this matter. *See generally* Dkt. Entry No. 3-1 at 36-37.

[6]  This estimate is based on an exchange rate of 1.5472 U.K. pounds to 1 U.S. dollar on October 27, 2008. *See* Board of Governors Federal Reserve System, Foreign Exchange Rates—H-10 Historical rates for the U.K pound, *available at* https://www.federalreserve.gov/releases/h10/hist/dat00_uk.htm.

not successful.

PSNI examined the statements from a bank account held by Smyth with Bank Santander. The police confirmed that a cheque in the sum of £20,000 was deposited in the account on October 28, 2008, one day after issuance. The statements cover the period from May 2007, until the account was closed on October 4, 2010. Police did not find any evidence that the funds were returned to S.S. or invested as promised, instead they found a monthly transfer of £400 from Smyth's account to S.S.'s account between November 2008 and March 2009. Police also examined a copy of the receipt Smyth gave S.S. on an AIMS headed paper. The receipt is dated October 27, 2008, with a handwritten note "Receipt of £20,000. £400 per month on 15th each month close of business, into nominated Abbey account."  It is signed "Marianne Smyth."

### C.    Fraud and theft #3[7]

On August 1, 2009, S.R. provided a statement to PSNI. S.R. stated that she met Smyth around 2005, as an employee of AIMS, when she arranged a new mortgage on her home. They later became friends, meeting socially on occasion. S.R. said that Smyth offered her an opportunity to invest in a high interest-bearing account, and that S.R. agreed to invest £23,000. S.R. transferred for that purpose £6,000 (approximately U.S.

---

[7] The evidence collected by PSNI concerning these offenses is set forth in the materials attached to the complaint in this matter. *See generally* Dkt. Entry No. 3-1 at 37-38.

5

$10,958)[8] on August 28, 2008, and £17,000 (approximately U.S. $30,266)[9] on September 30, 2008, to an account held by Smyth. S.R. stated that she made several requests to release some of her invested funds after May 2009, and that Smyth always made excuses and did not release the funds. S.R. stated that she has not heard from Smyth since June 2009, and that her later emails to Smyth went unanswered.

PSNI examined the statements from a bank account held by Smyth with Bank Santander. The police confirmed that a sum of £17,000 was transferred into Smyth's account on September 30, 2008, from an account held by S.R. The statements cover the period from May 2007, until the account was closed on October 4, 2010. Police did not find any evidence that the funds were returned to S.R. or invested as promised.

### D.   Fraud and theft #4[10]

On August 20, 2009, D.M. provided a statement to PSNI. D.M. stated that he met Smyth in around 2006 or 2007, as an employee of AIMS, when she arranged a new mortgage on his home. D.M. reported that in 2008, Smyth recommended that he and his wife, I.M., purchase a property at 3 Bracken Avenue, Newcastle, County Down. D.M. and his wife agreed to purchase the property, and D.M. gave Smyth two cheques to that

---

[8]  This estimate is based on an exchange rate of 1.8264 U.K. pounds to 1 U.S. dollar on August 28, 2008. *See* Board of Governors Federal Reserve System, Foreign Exchange Rates—H-10 Historical rates for the U.K pound, *available at* https://www.federalreserve.gov/releases/h10/hist/dat00_uk.htm.

[9]  This estimate is based on an exchange rate of 1.7804 U.K. pounds to 1 U.S. dollar on September 30, 2008. *See* Board of Governors Federal Reserve System, Foreign Exchange Rates—H-10 Historical rates for the U.K pound, *available at* https://www.federalreserve.gov/releases/h10/hist/dat00_uk.htm.

[10] The evidence collected by PSNI concerning these offenses is set forth in the materials attached to the complaint in this matter. *See generally* Dkt. Entry No. 3-1 at 38-40.

end: one cheque in the sum of £5,000 (approximately U.S. $9,913)[11] on March 21, 2008,

and another cheque in the sum of £67,570 (approximately U.S. $133,856)[12] on July 30,

2008. Both cheques were made payable to "Marianne Smyth." Smyth arranged all the

legal matters and presented them with what they believed to be a "contract of sale" that

they signed. Smyth also arranged for tenants to rent the property and informed D.M.

that she was to collect on his behalf a rental payment of £425 per month, that she would

deposit in his account. D.M. reported that the sum of £425 was paid into his account

each month from August 2008 until May 2009. He received no further rental payments

after that. D.M. repeatedly asked Smyth for the property deeds but never received them.

On July 1, 2009, D.M. and his wife went to visit the property and spoke to the

occupants. D.M. suspected that he was not the legal owner of the property. He

attempted to contact Smyth several times after that by telephone and email but did not

receive any response.

PSNI examined the statements from a joint bank account held by D.M. and his

wife. The police confirmed that a sum of £5,000 left the account on March 25, 2008,

and the sum of £67,570 left the account on August 12, 2008. When reviewing the

records from a bank account held by Smyth with Bank Santander. The police confirmed

that a cheque in the sum of £67,570 was paid into Smyth's account on August 9, 2008.

The records also showed that the sum of £425 was transferred from Smyth's account to

---

[11]  This estimate is based on an exchange rate of 1.9826 U.K. pounds to 1 U.S. dollar on March 21, 2008. *See* Board of Governors Federal Reserve System, Foreign Exchange Rates—H-10 Historical rates for the U.K pound, *available at* https://www.federalreserve.gov/releases/h10/hist/dat00_uk.htm.

[12]  This estimate is based on an exchange rate of 1.9810 U.K. pounds to 1 U.S. dollar on July 30, 2008. *See* Board of Governors Federal Reserve System, Foreign Exchange Rates—H-10 Historical rates for the U.K pound, *available at* https://www.federalreserve.gov/releases/h10/hist/dat00_uk.htm.

the M's account on August 30, 2008. The statements cover the period from May 2007, until the account was closed on October 4, 2010.

PSNI also searched Smyth's home and located the alleged "contract of sale" dated August 7, 2008, and signed by D.M. and his wife. A search of the records held by land and Property Services revealed to PSNI that the property on 3 Bracken Avenue, New Castle, County Down, was legally owned by J.B. and L.B.

J.B. provided a statement to PSNI on July 8, 2019, confirming that he had owned the property in question with his wife since around 1998, and that he had not sold or agreed to sell the property at any time. He stated that he had met Smyth in or around 2008, when he had considered re-mortgaging his property but had not proceeded with the re-mortgage. PSNI's investigation revealed that when her employment with AIMS ended in 2009, she continued to deprive the victims of their money. Her Santander bank account was closed on October 4, 2010.

### E.    As to all Alleged Offenses[13]

PSNI also interviewed the Director of AIMS in July 2018 who reported that Smyth had, in fact, worked for the company as a mortgage advisor between 2006 and 2009. He also reported that AIMS is a mortgage and insurance provider and that it did not render advise on or arrange for investments of any kind.

Moreover, each of the victims of the offenses identified the known photograph of Smyth as the person who engaged in the conduct described above. *See* Dkt. Entry No. 3-1 at 52-62.

---

[13] *See* Dkt. Entry No. 3-1 at 41.

## ARGUMENT

### I.    The Scope of the Extradition Hearing is Limited

Extradition is primarily an executive function with a specially defined role for a judicial officer, whom statute authorizes to determine whether to certify to the Secretary of State (the "Secretary") that the submitted evidence is "sufficient to sustain the charge." 18 U.S.C. §§ 3184; 3186; *Martin*, 993 F. 2d at 828; *Lo Duca v. United States*, 93 F. 3d 1100, 1110 n.10 (2d Cir. 1996). The Secretary, not the court, makes the decision regarding whether the fugitive ultimately should be surrendered to the requesting country. *See* 18 U.S.C. §§ 3184, 3186; *Escobedo v. United States*, 623 F. 2d 1098, 1105 (5th Cir. 1980) ("The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs."). The extradition judge has the limited duty of determining the request's sufficiency under the applicable treaty provisions. *Martin*, 993 F. 2d at 828-29. This function is carried out by conducting a hearing pursuant to 18 U.S.C. § 3184. "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F. 3d 103, 110 (1st Cir. 1997).

Thus, courts play a "limited role" in the extradition process. *Noeller v. Wojdylo*, 922 F.3d 797, 802 (7th Cir. 2019). "[U]nder 18 U.S.C. § 3184, the judicial officer's inquiry is limited to a narrow set of issues concerning the existence of a treaty, the offense charged, and the quantum of evidence offered. The larger assessment of

extradition and its consequences is committed to the Secretary of State." *Kin-Hong*, 110 F.3d at 110. "An extradition proceeding is not a trial, but rather is similar to a preliminary hearing." *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993); *see Kin-Hong*, 110 F.3d at 120. Extradition treaties do not require or even anticipate the testimony of live witnesses at the hearing because to do so "would defeat the whole object of the treaty." *See Yordi v. Nolte*, 215 U.S. 227, 231 (1909). Indeed, a contrary rule might compel the "demanding government to produce all its evidence here . . . in order to meet the defense thus gathered from every quarter." *Collins v. Loisel*, 259 U.S. 309, 316 (1922) (citation omitted).

Hearsay evidence is admissible at an extradition hearing and fully supports a court's findings leading to certification under § 3184. *See, e.g., Kin-Hong*, 110 F.3d at 120; *Bovio*, 989 F.2d at 259. A court may thus "properly consider" evidence, "whether sworn or unsworn, or whether the evidence consists of an actual statement given by a witness or a summary thereof." *United States v. Nolan*, 651 F. Supp. 2d 784, 798 (N.D. Ill. 2009) (citing cases). Moreover, an "accused in an extradition hearing has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof." *Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir. 1981). "To do otherwise would convert the extradition into a full-scale trial, which it is not to be." *Eain*, 641 F.2d at 511; *see Kin-Hong*, 110 F.3d at 118.

At the extradition hearing, the court should consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification—as defined in the Treaty, statutes, and case law—have been established.

10

*Quinn v. Robinson*, 783 F. 2d 776, 786 n.3 (9th Cir. 1986) (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)); *In re Extradition of Garcia*, 825 F. Supp. 2d 810, 815 (S.D. Tex. 2011). If the fugitive offers any explanatory evidence, the court should rule on its admissibility. Once the evidentiary record is complete, the court should make written findings of fact and conclusions of law as to each of the elements for certification, including separate findings for each offense as to which extradition is sought. *Shapiro v. Ferrandina*, 478 F. 2d 894, 905–06 (2d Cir. 1973), *cert. dismissed*, 414 U.S. 884 (1973). If the court finds that the requirements for certification have been met, the court must furnish the certification to the Secretary of State, together with a copy of the evidence and a transcript of any testimony presented at the hearing and must commit the fugitive to the custody of the United States Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184; *United States v. Wiebe*, 733 F.2d 549, 553 (8th Cir. 1984); *Ordinola v. Hackman*, 478 F. 3d 588, 597 (4th Cir.), *cert. denied*, 128 S. Ct. 373 (2007).

In fulfilling its function under Section 3184, the judicial officer should construe the Treaty liberally to effect its purpose, namely, the surrender of fugitives to the requesting country. *See Factor v. Laubenheimer*, 290 U.S. 276, 303 (1933) ("Extradition treaties are to be liberally, not strictly, construed."); *Wiebe*, 733 F.2d 549 at 554 ("Extradition treaties are to be construed liberally to effect their purpose, *i.e.*, the surrender of fugitives to be tried for their alleged offenses.") (citation omitted); *In re Extradition of Nezirovic*, No. CIV.A. 7:12MC39, 2013 WL 5202420, at *5 (W.D. Va. Sept. 16, 2013) ("Treaties are construed liberally to favor the obligation to surrender fugitives.") (citation omitted). As the Supreme Court explained in *Factor*:

11

> In choosing between conflicting interpretations of a treaty obligation, a
> narrow and restricted construction is to be avoided as not consonant with
> the principles deemed controlling in the interpretation of international
> agreements. Considerations which should govern the diplomatic relations
> between nations, and the good faith of treaties, as well, require that their
> obligations should be liberally construed so as to effect the apparent
> intention of the parties to secure equality and reciprocity between them.

290 U.S. at 293. To carry out a treaty obligation, the treaty "should be construed more

liberally than a criminal statute or the technical requirements of criminal procedure."

*Id.* at 298. This country does not expect foreign governments to be versed in our

criminal laws and procedures. *Grin v. Shine*, 187 U.S. 181, 184 (1902). Thus, "[f]orm is

not to be insisted upon beyond the requirements of safety and justice." *Fernandez v.*

*Phillips*, 268 U.S. 311, 312 (1925). A court should afford great weight to statements by

the Secretary regarding treaty interpretation. *See El Al Israel Airlines*, *Ltd. v. Tseng*, 525

U.S. 155, 168 (1999); *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85

(1982) ("Although not conclusive, the meaning attributed to treaty provisions by the

Government agencies charged with their negotiation and enforcement is entitled to

great weight."); *Ahmad v. Wigen*, 726 F. Supp. 389, 402 (E.D.N.Y. 1989), *aff'd*, 910 F.

2d 1063 (2d Cir. 1990) ("The State Department's view deserves deference, unless it

represents a substantial departure from national or international norms.").

## II.    The Requirements for Certification Are Satisfied

In its role, the Court must certify to the Secretary of State that a fugitive is

extraditable when the following requirements have been met: (1) the judicial officer is

authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the

fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for

which surrender is requested are covered by the treaty; and (5) there is sufficient

evidence to support a finding of probable cause as to the charge. 18 U.S.C. § 3184; *see Fernandez*, 268 U.S. at 312; *Noeller*, 922 F.3d at 803-04; *Ordinola*, 478 F.3d at 608. Each of those elements is satisfied here.

### A.  This Court Has Subject Matter Jurisdiction to Conduct These Extradition Proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184; *Wiebe*, 733 F.2d at 553. As such, the judicial officer conducting the extradition hearing that Section 3184 prescribes does not exercise "any part of the judicial power of the United States" but, rather, acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (quotation marks and citations omitted). Both magistrate judges and district judges may render a "certification" under Section 3184. *See Jimenez v. Aristeguieta*, 311 F. 2d 547, 553–55 (5th Cir. 1962) (any judicial officer in class authorized by statute may conduct extradition hearing); *Austin v. Healey*, 5 F. 3d 598, 601-02 (2d Cir. 1993) (magistrate judge authorized to conduct extradition hearing without specific delegation of authority); *United States v. Risner*, No. 3:18-MJ-765-BN, 2019 WL 6118377, at *2 (N.D. Tex. Nov. 18, 2019). This Court has subject matter jurisdiction to conduct these proceedings.

### B.  This Court Has Personal Jurisdiction Over Smyth

This Court has personal jurisdiction over Smyth pursuant to 18 U.S.C. § 3184 because she was found and arrested in the District of Maine. *See* 18 U.S.C. § 3184 (the Magistrate Judge "may, upon complaint made under oath, charging any person found

13

within his jurisdiction, . . issue his warrant for the apprehension of the person so charged"); *see also, e.g., Pettit v. Walshe*, 194 U.S. 205, 219 (1904) ("The commissioner or judicial officer here referred to is necessarily one acting as such within the state in which the accused was arrested and found.").

### C.  The Applicable Extradition Treaty is in Full Force and Effect

The extradition statute, 18 U.S.C. § 3184, provides for extradition where a treaty or convention is in force between the requesting state and the United States. *See, e.g., In re Chan Kam-Shu*, 477 F. 2d 333 (5th Cir. 1973), cert. denied, 414 U.S. 847 (1973); *Hoxha v. Levi*, 465 F. 3d 554, 562 (3d Cir. 2006); *United States ex rel Saroop v. Garcia*, 109 F. 3d 165, 171 (3d Cir. 1997). There is an extradition treaty in full force and effect between the United States and the United Kingdom. *See* Dkt. Entry No. 3-1 at 1¶ 2 (Hauf Declaration). The State Department's conclusion that the Treaty is in full force and effect, as expressed in this declaration, is entitled to deference. *See Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight"); *accord Sumitomo Shoji Am., Inc.,* 457 U.S. at 184; *Charlton*, 229 U.S. at 468; *see In re Extradition of Caro*, 283 F. Supp. 3d. 993, 1002 (D. Colo. 2017) ("When the government provides a declaration from an attorney in the Department of State attesting that the treaty is in full force and effect, then the Court should extend deference to that determination.").

### D.  The Extradition Treaty Encompasses the Offense for which Extradition is Requested

Extradition treaties create an obligation for the United States to surrender fugitives under particular circumstances. Here, the Treaty provides that the "Parties

14

agree to extradite to each other, pursuant to the provisions of this Treaty, persons sought by the authorities in the Requesting State for trial or punishment for extraditable offenses."  Treaty, art. 1. The Treaty further provides, "[a]n offense shall be an extraditable offense if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of one year or more or by a more severe penalty." *See* Dkt. Entry No. 3-1 at 12, Treaty, art. 2(1). Continuing, "an offense shall be an extraditable offense: (a) whether or not the laws in the Requesting and Requested States place the offense within the same category of offenses or describe the offense by the same terminology; or (b) whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being jurisdictional only."  *Id.* at Treaty, art. 3.

The United Kingdom requests Smyth's extradition for engaging in four fraudulent schemes while she worked as a mortgage advisor for AIMS and deceived her client victims into believing she would invest their money in a high-interest bearing account or real estate, but instead took their money and absconded. The United Kingdom seeks Smyth's extradition on four counts of fraud in violation of Sections 1 and 4 of the United Kingdom's Fraud Act of 2006, and four counts of theft in violation of Section 1 of Northern Ireland's Theft Act of 1969.

Under the law of the United Kingdom, these fraud offenses each carry a potential penalty exceeding one year of imprisonment. *See* Dkt. Entry No. 3-1 at 32 (confirming extradition is sought on four counts of fraud); *Id.* at 69 (confirming the United Kingdom

intends to proceed by indictment); *Id.* at 74 (Fraud Act § 1(3)(b) (the offense of fraud, on indictment, carries a maximum sentence of ten years imprisonment)).

Similarly, under the law of the United Kingdom, these theft offenses each carry a potential penalty exceeding one year of imprisonment. *See* Dkt. Entry No. 3-1 at 32 (confirming extradition is sought on four counts of theft); *Id.* at 69 (confirming the United Kingdom intends to proceed by indictment); *Id.* at 71-73 (Theft Act §§ 1, 7 (the offense of theft, on indictment, carries a maximum sentence of ten years imprisonment)).

Accordingly, the Treaty's requirement that the offense for which extradition is sought be punishable under United Kingdom law by deprivation of liberty for a period of one year or more is satisfied. Notably, the First Circuit has held that "courts are duty bound to defer to a surrendering sovereign's reasonable determination that the offense in question is extraditable." *United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995).

In accordance with the above-referenced terms of the Treaty, the Court must also determine whether the alleged misconduct would constitute a felony in the United States if it had been committed here under similar circumstances, a requirement known as dual criminality. "The purpose of the dual criminality requirement is simply to ensure that extradition is granted only for crimes that are regarded as serious in both countries." *Kin-Hong*, 110 F.3d at 114 (1st Cir. 1997) (citing *Saccoccia*, 58 F.3d at 766). In evaluating whether dual criminality is met, the Supreme Court has held that "[i]t is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922); *see also, e.g., Saccoccia*, 58 F.3d at 766 ("If the same conduct is subject to criminal sanctions in both jurisdictions, no more is eligible."); *Arias Leiva*

*v. Warden*, 928 F.3d 1281, 1293 (11ᵗʰ Cir. 2019) (in evaluating dual criminality, "courts ask whether the conduct that the government describes would violate our laws if it occurred in this country"). Thus, in assessing whether the Treaty covers the offenses for which the United Kingdom seeks extradition, the Court should examine the description of criminal conduct that the United Kingdom has provided and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See Cucuzzella v. Keliikoa*, 638 F. 2d 105, 107-108 (9th Cir. 1981). In addition, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" *Grin*, 187 U.S. at 184; *see Factor*, 290 U.S. at 303, the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); *see also Martinez v. United States*, 828 F. 3d 451, 463 (6th Cir. 2016) (*en banc*) ("The point of an extradition treaty after all is to facilitate extradition . . . ."). A requesting country is not obliged to establish that its crimes are identical to ours. *See United States v. Levy*, 905 F.2d 326, 328 (10th Cir. 1990) ("The focus of dual criminality is not on how the crime is defined in the particular statutes the defendant is accused of violating; it is on the criminality of the defendant's alleged conduct. If the acts upon which the charges of the requesting country are based are also proscribed by a law of the requested nation, the requirement of double criminality is satisfied.

The description of Smyth's conduct in the documents the United Kingdom has provided satisfies the Treaty's dual criminality requirement. The same alleged conduct, if committed in the United States, would be criminal and punishable by more than one

year of imprisonment under statutes including 18 U.S.C §1341 (wire fraud),[14] and 17 M.R.S.A. §353(1)(B)(1) (theft by unauthorized taking or transfer)[15] or 17 M.R.S.A. §354(B)(1) (theft by deception).[16]

Accordingly, the Treaty covers the offenses for which the United Kingdom seeks extradition. *See also* Dkt. Entry No. 3-1 at 2, ¶5 (Hauf Decl. stating that Article 2 of the Treaty covers the offenses for which the United Kingdom seeks extradition).

### E.  There is Probable Cause to Believe Smyth Committed the Alleged Offenses

The standard of proof to find the evidence "sufficient to sustain the charge . . ." pursuant to Section 3184 is the familiar domestic requirement of probable cause. 18 U.S.C. § 1384; *see, e.g., Collins*, 259 U.S. at 316 ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."); *Benson v. McMahon*, 127 U.S. 457, 463 (1888) (extradition hearings are akin to "preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused"). Probable cause is established if

---

[14]  18 U.S.C. § 1341 provides in pertinent part, "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . shall be fined under this title or imprisoned not more than 20 years, or both."

[15]  17 M.R.S.A. § 353(1)(B)(1) provides in pertinent part, "A person is guilty of theft if: (A) The person obtains or exercises unauthorized control over the property of another with intent to deprive the other person of the property. . . . (B) The person violates paragraph A and: (1) The value of the property is more than $10,000. Violation of this subparagraph is a Class B crime[.]"  17 M.R.S.A. § 1604 provides in pertinent part, "[T]he maximum term of imprisonment is as follows: . . . (B) In the case of a Class B crime, 10 years[.]"

[16]  17 M.R.S.A. § 354(B)(1) provides in pertinent part, "A person is guilty of theft if: (A) The person obtains or exercises control over property of another as a result of deception and with intent to deprive the other person of the property. . . . or (B) The person violates paragraph A and: (1) The value of the property is more than $10,000. Violation of this subparagraph is a Class B crime[.]"

there are "facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh,* 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted).

The probable cause determination is "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (internal quotation marks and citation omitted); *see Haxhiaj v. Hackman*, 528 F.3d 282, 287 (4th Cir. 2008) ("The extradition hearing is not to serve as a full-blown trial and serves simply to permit a limited inquiry into the presence of probable cause to believe that there has been a violation of one or more of the criminal laws of the extraditing country.") (internal quotation marks omitted).

According to the information the Government of the United Kingdom has provided, Section 1 the Fraud Act 2006 provides in pertinent part, "A person is guilty of fraud" if she is in breach of Section 4 (fraud by abuse of power). *See* Dkt. Entry No. 3-1 at 74. Section 4 of the Fraud Act of 2006 provides in pertinent part that fraud by abuse of position is committed where (1) a person "occupies a position in which he is expected to safeguard or not to act against the financial interests of another person"; "dishonestly abuses that position"; and (3) intends to make a gain for himself or to cause loss to another or to expose another to a risk of loss. *Id.* at 75.

Moreover, the information provided by the United Kingdom establishes that Section 1 of Northern Ireland's Theft Act of 1969 provides in pertinent part, "A person is guilty of theft if he dishonestly appropriates property belonging to another with the

intention of permanently depriving the other of it[.]" *See* Dkt. Entry No. 3-1 at 71."

Here, the evidence submitted by the United Kingdom in support of its extradition request and summarized at Background paragraphs A through E, *supra*, amply supports a finding of probable cause to believe that Smyth committed each of the offenses for which the United Kingdom seeks her extradition: four fraud offenses and four theft offenses. The submissions from the United Kingdom include copies of the arrest warrants; a statement from the PSNI Detective Constable, discussing evidence including witness statements and bank reports; and a statement from the Principal Public Prosecutor of the Public Prosecution Service for Northern Ireland. *See generally* Dkt. Entry No. 3-1 at 28-62, 80-103 (investigative materials); 63-75 (statement of prosecutor David McLean with appended foreign legal provisions).

The evidence establishes probable cause to believe Smyth committed the alleged fraud and theft offenses.[17] Smyth worked as a mortgage advisor for AIMS and in that capacity she occupied a position of trust, that is, she was expected to safeguard and not act against the interests of her clients. Instead, she lied to these clients and took money from them for non-existent investment opportunities. She capitalized on the relationship that she had with the victims and the trust that they placed in her to convince them that she was investing their money when she was not. She was depositing it into her own account. When she left the employment of AIMS in 2009, she kept their money; permanently depriving them of the same. As discussed above, and reflected in the documents filed on the docket, all the victims have cooperated with PSNI and provided statements regarding Smyth's conduct. Moreover, they have identified a

---

[17] *See* Background paragraphs A though E, *supra.*

photograph of Smyth as the person who defrauded them. The facts and circumstances described herein and in the documents submitted to the Court are sufficient to lead a reasonably prudent person to believe that Smyth has committed the crimes of fraud and theft. Thus, there is probable cause to believe that she committed the offenses for which extradition is sought.

## III.  Extraditions Follow Unique Procedures

### A.  An Extradition Hearing Is Not a Criminal Proceeding

As stated above, an extradition hearing is not a criminal proceeding. Its purpose is to decide the sufficiency of the charges under the Treaty, not to determine the guilt or innocence of the accused; that is for the foreign court. *See, e.g.*, *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Because of the limited nature of the hearing, special procedural and evidentiary rules apply. Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings.[18]  *See Balzan v. United States*, 702 F.3d 220, 224 (5th Cir. 2012); *Sayne*, 418 F.2d at 685 ( "unique rules of wide latitude govern reception of evidence" in extradition hearings) (citation and internal quotation marks omitted). The fugitive's right to present evidence is constrained, and his constitutional rights are limited. The fugitive has no right to cross-examine witnesses who might testify at the hearing or to confront his accusers, *see Ordinola*, 478 F.3d at 608; *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); and no Sixth Amendment right to a speedy extradition, *see McDonald v. Burrows*, 731 F.2d 294, 297 (5th Cir. 1984); *Sabatier v. Dabrowski*, 586 F.2d 866, 869 (1st Cir. 1978). Moreover, the

---

[18]  Fed. R. Crim. P. 1(a)(5)(A) states: "Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive." Fed. R. Evid. 1101(d)(3) provides: "These rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."

exclusionary rule is inapplicable. *See Simmons v. Braun*, 627 F.2d 635, 636–37 (2d Cir. 1980).

### B.  Extradition Hearings Rely on Written Submissions and Do Not Require Live Witnesses

As stated above, a certification of extradition may be, and typically is, based entirely on the authenticated documentary evidence and information that the government seeking extradition has provided. *See, e.g.*, *Bovio v. United States*, 989 F.2d 255, 259–61 (7th Cir. 1993) (Swedish investigator's statement sufficient to establish probable cause); *Zanazanian*, 729 F. 2d at 627-28 (police report describing witness statements is competent evidence). The finding may rest upon written statements from a foreign prosecutor or judge summarizing the evidence. *See Rice v. Ames*, 180 U.S. 371, 375–76 (1901); *accord Glucksman v. Henkel*, 221 U.S. 508, 513-14 (1911); *Garcia*, 825 F. Supp. 2d at 830 ("[E]xtradition may be predicated entirely on the 'unsworn statements of absent witnesses.'") (quoting *Collins*, 259 U.S. at 317).

Extradition treaties do not require, or even anticipate, live witness testimony at the hearing. *See Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986). Requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham*, 241 U.S. at 517. Further, hearsay evidence is admissible at an extradition hearing and may fully support the court's findings leading to a certification under Section 3184. *See Collins*, 259 U.S. at 317; *O'Brien v. Rozman*, 554 F.2d 780, 783 (6th Cir. 1977) (citing cases); *Haxhiaj*, 528 F.3d at 292 ("[C]ourts have consistently concluded that hearsay is an acceptable basis for a probable cause determination in the extradition context. Unsworn statements can be sufficient to support a probable cause determination.").

The Treaty and federal statute govern the nature and admissibility of evidence at an extradition hearing. The Treaty lists the submissions the United Kingdom must make in support of extradition. *See* Dkt. Entry No. 3-1 at 15 (Article 8). The Treaty also provides that documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. *See* Dkt. Entry No. 3-1 at 16 (Article 9). Here, the documents submitted to support extradition are admissible at the extradition hearing in accordance with Article 9. *See* Dkt. Entry No. 3-1 at 2 ¶6.

### C. The Fugitive's Evidence Is Very Limited

Due to the nature and limited purpose of an extradition hearing under 18 U.S.C. § 3184 and the importance of the United States' fulfilling its extradition treaty obligations, a fugitive's opportunity to challenge the evidence introduced against him is very circumscribed. A fugitive may not introduce evidence that contradicts the evidence the government submits on behalf of the requesting country and may only introduce evidence explaining the submitted evidence. *See Charlton*, 229 U.S. at 457-58; *Ordinola*, 478 F.3d at 608; *Garza v. United States*, 180 F. App'x 522, 523 (5th Cir. 2006) ("Evidence contradicting the Government's evidence is not permitted at an extradition hearing, so as to avoid a trial of guilt or innocence.") (citing *Collins*, 259 U.S. at 316–17; *Sayne*, 418 F.2d at 685); *In re Extradition of Ramos Herrera*, 268 F. Supp. 2d 688, 696 (W.D. Tex. 2003) (extradition judges "are not expected to decide conflicting

factual claims between the [requesting state] and the accused").[19] A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)).

Courts routinely reject technical and affirmative defenses in extradition proceedings. *See Bingham*, 241 U.S. at 517 (rejecting objections that "savor of technicality"); *Charlton*, 229 U.S. at 462; *Collins*, 259 U.S. at 316–17; *Hooker*, 573 F.2d at 1368 (court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"); *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1112 (7th Cir. 1997), *cert. denied*, 525 U.S. 810 (1998) ("Affirmative defenses not specified in the treaty may not be considered."). A fugitive may not introduce evidence to impeach the credibility of the requesting country's witnesses. *Bovio*, 989 F.2d at 259. These matters require determinations for a foreign court.

### D. The Executive Branch Considers Matters Other Than Sufficiency; Rule of Non-Inquiry

Other than the sufficiency of the evidence, all matters that a fugitive may raise as defenses to extradition are to be considered by the Secretary, not by the court. *See* 18 U.S.C. §§ 3184, 3186. The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding treatment in the requesting country. *See, e.g.*, *Escobedo*, 623 F.2d at 1105. This is consistent with the long-held understanding that deciding whether to surrender a fugitive to a foreign government is

---

[19] The extent to which a fugitive may offer explanatory proof is within the court's discretion. *See Koskotas v. Roche*, 931 F.2d 169, 175 (5th Cir. 1991); *Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir.), *cert. denied*, 439 U.S. 932 (1978); *United States ex rel Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963), *cert. denied*, 376 U.S. 952 (1964).

"purely a national act . . . performed through the Secretary of State" within the executive's powers to conduct foreign affairs. *In re Kaine*, 55 U.S. 103, 110 (1852). A fugitive's contention that the extradition request is politically motivated or that the requesting state's justice system is unfair should be addressed by the Secretary, not the court. *Koskotas*, 931 F.2d at 173-74 (requesting state's motives are for executive branch to consider).

## CONCLUSION

WHEREFORE, the United States respectfully requests that the Court conduct a hearing pursuant to 18 U.S.C. § 3184 to determine whether the evidence presented is sufficient to sustain the charge under the provisions of the Treaty and to certify Smyth's extradition to the United Kingdom for the Secretary of State's surrender decision.

Dated at Bangor this ___ day of February 2024.

Respectfully submitted,

DARCIE N. MCELWEE
United States Attorney

/s/Joel B. Casey
JOEL B. CASEY
Assistant U.S. Attorney

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2024, I electronically filed the Government's Memorandum of Law in Support of Extradition with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Kaylee J. Folster, Esq.
kjf@vbk.com

DARCIE N. MCELWEE
United States Attorney

/s/Joel B. Casey
Assistant U.S. Attorney
United States Attorney's Office
202 Harlow Street, Suite 111
Bangor, ME 04401
(207) 945-0373

26